UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No. _____

LOCAL 689, AMALGAMATED TRANSIT }
    UNION,                          }
2701 Whitney Place               }
Forestville, MD 20747           }
                Plaintiff,    }
                         }
                         }
       v.                  }
                         }
                         }
WASHINGTON METROPOLITAN AREA }
    TRANSIT AUTHORITY,      }
600 Fifth Street, N.W.          }
Washington, D.C. 20001       }
                Defendant.   }
                         }

COMPLAINT
AND MOTION TO CONFIRM
ARBITRATION AWARD

## NATURE OF ACTION

1.    This is a civil action against the Washington Metropolitan Area Transit Authority

("WMATA") to confirm and enforce an arbitration award, issued on October 30, 2013,

under the binding arbitration provision of a collective bargaining agreement between the

Plaintiff Union and Defendant WMATA.

## JURISDICTION, VENUE AND GOVERNING STATUTES

2.    Original jurisdiction of civil disputes in which WMATA is a party lies in the United

States District Courts, WMATA Compact, DC Code Section 9-1107.01 (81) (Adopted by

Congress as P.L. 89-774).  The arbitration was conducted by the parties in the District of

2

Columbia, where WMATA's principal office is located, and many employees of

WMATA represented by Plaintiff Local 689, ATU work in the District of Columbia, thus

supporting venue in this Court.  Finally, this action is delimited by the provisions of the

United States Arbitration Act, 9 U.S.C. Section 9, and the District of Columbia Model

Arbitration Act, D.C. Code Section 16-4423.

## THE PARTIES

3.      Defendant Washington Metropolitan Area Transit Authority ("WMATA") is political

subdivision of the District of Columbia, Commonwealth of Virginia and the State of

Maryland, created by legislative compact among those jurisdictions and by the United

States of America to provide mass transportation services to citizens who travel within

and among all three jurisdictions.  WMATA owns and operates Metrobus, Metrorail and

MetroAccess transportation systems (MetroAccess service operated through contracts

with various private companies) and has the capacity to sue and be sued.  WMATA labor

relations are authorized and depicted in Section 66 of the Compact, DC Code Section 9-

1107.01(66).   WMATA's principal office is located at 600 5th Street, NW, Washington,

DC, 20001.

4.      Plaintiff Local 689, Amalgamated Transit Union, ("Local 689" or "the Union")

represents for purposes of collective bargaining drivers, mechanics, clerical and

maintenance personnel who are employed by WMATA in a wide variety of

classifications throughout its operations.  Local 689 has represented continuously for

over 90 years public transit workers in the District of Columbia and surrounding areas

3

who worked for WMATA and its predecessors. The principal office of Local 689 is located at 2701 Whitney Place, Forestville, MD, 22747.

## THE PARTIES' RELATIONSHIP

5.     Plaintiff and Defendant are parties to a collective bargaining agreement which, as the WMATA compact requires, provides that all "labor disputes" which arise between them must be resolved through arbitration and further that the determination of a Board of Arbitration shall be "final and binding." (Contractual Excerpts Attached, Complaint Exhibit A)

## THE CURRENT DISPUTE

6.     On the date of October 30, 2013, a Board of Arbitration comprised of Neutral Chairman James Oldham, WMATA-appointed arbitrator Donna Gaffney and Union-appointed arbitrator Douglas Taylor resolved by award the grievance of landscape worker William Hill. (Award Attached, the "Oldham Award," Complaint Exhibit B)

7.     Mr. Hill had been discharged by WMATA on May 30, 2012. He lost accrued seniority, health care, accrued vacation and paid sick leave and credited service for pension purposes. The Decision of the arbitration award was: "The Authority's decision to terminate the grievant is to be converted to a 90-day suspension. The grievant is to be reinstated with full seniority and with back pay and benefits, except for the 90-day suspension." (Complaint Exhibit B, p. 10)

8.     The grievant William Hill has not been reinstated, granted full seniority, back-pay or benefits in accordance with the award.

4

9.   There has been no Motion to Correct or to Vacate the award under any of the applicable

Statutes, 9 U.S.C. Sections 10 and 11, or D. C. Code Sections 16-4420, 4423 or 4424,

and any such Motion would now be untimely.


## CAUSES OF ACTION

### COUNT I --- CONFIRMATION OF ARBITRATION AWARD

10.   All allegations set forth above are repeated and included in this Count.

11.   Confirmation of an arbitration award is mandatory under certain circumstances:

> After a party to an arbitration proceeding receives notice of an award, the party
> may make a motion to the court for an order confirming the award at which time
> the court shall issue a confirming order unless the award is modified or corrected
> pursuant to § 16-4420 or 16-4424 or is vacated pursuant to § 16-4423.

D.C. Code Section 16-4422 (see also 9 U.S.C. Section 9)

12.   Since the award has not been modified, corrected or vacated, and the time has elapsed for

any such motion to be filed, (that period is 90 days from the date the parties received

notice of the award, D.C. Code Section 1623( c)) the Oldham Award must be confirmed.


### COUNT II — VIOLATION OF THE WMATA COMPACT

13.   All allegations set forth above are repeated and included in this Count.

14.   Defendant WMATA and its officials are governed by and obliged to implement the

provisions of the Compact, including Section 66 ( c), which requires, *inter alia*, that "The

determination of the majority of the board of arbitration, thus established shall be final

and binding on all matters in dispute." D.C. Code Section 9-1107.01(66c)

15.   Necessarily, if the decision of a "majority of the board of arbitration" is to be "final and binding" its directives must be obeyed, as ministerial acts by WMATA officials.

16.   By failing or refusing to act as directed by the Board of Arbitration, WMATA violates the express terms of the WMATA Compact.


REMEDIES

17.   This Court should order, without delay:

    A.   The Oldham Award, dated October 30, 2013, between Local 689, Amalgamated Transit Union and the Washington Metropolitan Area Transit Authority is Confirmed.

    B.   WMATA, including each and all of its officials, directors and employees shall Implement the decision of the Oldham Award by the following acts, all undertaken as ministerial duties (this order in the nature of mandamus):

        i.   Reinstate William Hill to employment.

        ii.   Restore William Hill to his place on seniority rosters.

        iii.   Restore William Hill's benefits, including but not limited to health care, accrued sick leave, vacation leave and credited pension service.

        iv.   Pay to William Hill the wages which he would have earned during the period elapsed between August 29, 2012 (90 days after his discharge on May 30, 2012) and the date of his reinstatement to active duty.

    C.   WMATA, through its counsel, shall report to the Court, no later than 30 days following the date of the order, that the above orders have been completed, indicating to the court the location and assignment of William Hill as a WMATA employee, his seniority, the terms of his health care enrollment, the amount of his accrued vacation entitlement, the number of paid sick leave days available to him if he becomes too ill to work, the status of his accrued

6

pension benefit and the amount paid to him as "back pay," including a detailed explanation of how the amount was calculated.

D.    WMATA shall reimburse Plaintiff Union for all the costs of bringing this action, including reasonable attorneys' fees, and any other relief or actions which may be required in the opinion of the Court.

Plaintiff LOCAL 689, AMALGAMATED TRANSIT UNION, by its Attorneys,

Douglas Taylor 959502
Paul M. Tyler
Brian Connolly

Gromfine, Taylor & Tyler
1727 King Street, Suite 500
Alexandria, VA   22314

(703) 683-7780
dtaylor@lbgt.com

# COMPLAINT

# EXHIBIT

# A

# AGREEMENT

### between

## WASHINGTON METROPOLITAN
## AREA TRANSIT AUTHORITY

### and

## LOCAL UNION 689

### of the

## AMALGAMATED TRANSIT UNION
## AFL-CIO

**Effective from May 1, 2004**

**through**

**June 30, 2008**

given a copy of that statement. No employee will be removed from service until the Authority has completed its investigation and specifically described the disciplinary action to be taken. No employee may be disciplined for an accident in which mechanical fault is alleged to have contributed to the accident unless the Authority's test of that mechanical equipment is attended by a designated Union representative. No platform instructor may be disciplined for an accident, which occurs while the instructor's student is operating the vehicle.

The Authority shall, without further cause or recourse to any program, discontinue the employment of any employee who violates the Substance Abuse Policy within the first six months of employment. Except as provided in the next sentence, any such discharge shall not be subject to the grievance procedure contained in this Section 104. A non-probationary employee who is discharged for violating the Substance Abuse Policy pursuant to this provision can use the grievance procedure contained in this Section 104 to challenge the validity of a positive test for drugs or alcohol (but may not use such procedure to challenge any other aspect of such discharge). This provision shall apply to employees hired on or after May 1, 2002.

(e) It shall be the policy of the Authority not to suspend employees for misses or other minor violations of the rules if the necessary result can be obtained by other means of discipline. Suggestions from the Union will be welcomed regarding the best way to ensure good service without hardship on the employees.

(f) If, when an employee is suspended or discharged, it is found either through agreement by the Authority and the Union or by the judgment of the Board of Arbitration, that the employee was suspended or discharged without sufficient cause, the employee shall be reinstated in the employee's former position and paid for the time lost at the employee's regular rate during such suspension or discharge, but if in the case of such discharge it is found that a suspension would have been proper, the time for a reasonable suspension shall be deducted from the payment of such lost time. An employee who, as the result of the resolution of a grievance, receives retroactive pay in excess of one month shall furnish written authorization permitting the Authority to obtain Social Security records to verify interim income.

(g) An employee, not permitted to work on account of the employee's physical condition, who feels capable of performing his/her duties, and whose physician contends is physically able to do so, may request that independent medical testimony be obtained and considered by the Authority before reaching a final decision; provided, however, that the employee's physician shall have the privilege of being present (without cost to the Authority) at any and all examinations to obtain independent medical testimony, and that the employee shall be furnished a copy of such medical reports.

**Sec. 105 - Arbitration of Questions and Grievances**
Properly accredited representatives of the Authority shall meet and treat with properly accredited representatives of the Union, on all questions and grievances in accordance with

Section 104. Questions or grievances that cannot be amicably adjusted by said conferences shall be submitted to a Board of Arbitration composed of three (3) persons, one (1) to be chosen by the Authority, one (1) to be chosen by the Union, and the two (2) thus selected to select a third disinterested arbitrator; the findings of a majority of said Board of Arbitration to be final and binding. Each of the parties hereto shall name its arbitrator within five (5) days after having received written notice from the other party hereto, and if either party fails to name its arbitrator it shall forfeit its case. If, after a period of ten (10) days from the date of the appointment of the two (2) arbitrators representing the Union and the Authority, the third arbitrator has not been selected, then either arbitrator may request the American Arbitration Association to furnish a list of five (5) persons from which one (1) shall be selected to act as the third arbitrator. The arbitrators appointed by the parties, no later than five (5) days after the receipt of such list, shall determine by lot the order of elimination, and thereafter each shall in that order alternately eliminate one (1) name until only (1) name remains. The remaining person on the list shall be the third arbitrator. All the conditions in this contract shall remain undisturbed during the arbitration proceedings. Each of the parties hereto shall bear the expense of its own arbitrator and the parties hereto shall jointly bear the expense of the third arbitrator.

## Sec. 106 - Arbitration of Future Contracts

In the event that, pursuant to Section 601 of this Agreement, either party requests changes in this Agreement or requests termination of all or any part of this Agreement and negotiations fail to result in an agreement between the parties, all issues in dispute shall be submitted to a Board of Arbitration on written demand of either party. The Board of Arbitration shall be composed of three (3) persons, one (1) to be chosen by the Authority, one (1) to be chosen by the Union, and the two (2) thus selected to select one (1) disinterested arbitrator. The findings of a majority of said Board of Arbitration shall be final and binding on the parties hereto. Each of the parties hereto shall name its arbitrator within five (5) working days after having received written notice from the other party hereto, and if either party fails to name its arbitrator it shall forfeit its case. If, after a period of five (5) working days from the date of the appointment of the two (2) arbitrators representing the Union and the Authority the disinterested arbitrator has not been selected, then either arbitrator may request the American Arbitration Association to furnish a list of five (5) persons, members of the National Academy of Arbitrators, from which the third arbitrator shall be selected. The Association shall be asked to furnish such list within seven (7) working days of the receipt of the request. The arbitrators appointed by the parties, no later than five (5) working days after the receipt of such list, shall determine by lot the order of elimination and thereafter each shall in that order alternately eliminate one (1) name until only one (1) name remains. The remaining person on the list shall be the disinterested arbitrator and shall act as chairman of the board. All the conditions in this contract shall remain undisturbed during the arbitration proceedings. Each of the parties hereto shall bear the expense of its own arbitrator, and the parties hereto shall jointly bear the expense of the third arbitrator. The Board of Arbitration shall hear evidence and arguments on all matters in dispute as expeditiously as practicable. The findings of a majority shall be submitted without undue delay and shall be retroactive to the expiration date of the contract.

# COMPLAINT

# EXHIBIT

# B

*Final*
*(signed)*

| | | |
|---|---|---|
| IN THE MATTER OF ARBITRATION | : | |
| BETWEEN | : | |
| WASHINGTON METROPOLITAN AREA | : | |
| TRANSITY AUTHORITY | : | |
| | : | |
| and | : | |
| ALMALGMATED TRANSIT UNION | : | |
| LOCAL 689 | : | Grievance of William Hill |
| | : | |
| Board of Arbitration: | : | |
| Douglas Taylor, Union | : | |
| Donna Gaffney, Authority | : | |
| James Oldham, Neutral | : | |
| Advocates: | : | |
| For WMATA: | : | |
| | : | |
| Donna Gaffney | : | |
| Senior Labor Relations Officer | : | |
| | : | |
| For the Union: | : | |
| Douglas Taylor, Esq. | : | |
| Gromfine, Taylor and Tyler, P.C. | : | |

**WMATA and ATU, Local 689**
**Grievance of William Hill**                                    **October 30, 2013**

### Background

This case involves a grievance filed on June 4, 2012 by William Hill protesting his termination from employment by WMATA ("the Authority"), as of May 30, 2012. The May 30 termination memorandum was sent to the grievant by Randall Grooman, Director of Plant Maintenance. The grievant was dismissed from his position of gardener because of a workplace violence incident on May 8, 2012. The grievance was carried through the contractual steps of the grievance procedure,[1] after which the grievance was referred to arbitration. The arbitration hearing commenced on February 5, 2013 and was concluded on February 26, 2013.[2] Post-hearing briefs were filed by the parties on May 7, 2013.

### Applicable Contract Provisions, Rules, and Policies

Section 104(d) of the Collective Bargaining Agreement ("CBA") provides that, "An employee will not be discharged, suspended, or otherwise disciplined . . . without sufficient cause." Also, Section 102(b) of the CBA provides, *inter alia*, that "The development and enforcement of reasonable rules and regulations regarding employment are the prerogatives of the Authority and are reserved by the Authority unless expressly waived by specific provisions of this agreement, or by the past practices of the parties."

---

[1] The Authority's denial of the grievance at Step II and Step IV was confirmed in writing by letters to the Union from, respectively, Christopher Moore, Acting Superintendent, Grounds Maintenance and Custodial Services Branch, Office of Plant Maintenance (dated July 29, 2012) and Donna Gaffney, Senior Labor Relations Officer (dated November 6, 2012).
[2] The hearing was suspended on February 5 and carried over to February 26 because of the indisposition of one of the parties' representatives.

Also relevant are provisions from the Authority's Workplace Violence Policy and from the Metro Rail Safety Rules and Procedures Handbook ("MSRPH").  Section 1.01 of the Workplace Violence Policy, Policy/Instruction 7.8.3, reads as follows:

> 1.01    Washington Metropolitan Area Transit Authority's (Metro) Policy, consistent with safety and security commitments to employees, customers, visitors and contractors, maintains zero tolerance for threats and/or acts of violence in the workplace.

MSRPH Rules of Conduct include the following:

> 2.3
> Employees shall conduct themselves quietly and without altercation; avoiding harsh, violent, profane, or insolent language while on about WMATA premises, whether on or off duty.
> 2.4
> Employees shall not threaten or intimidate other employees or members of the public.

## Issues

The questions to be decided in this proceeding are whether the grievant was terminated for sufficient cause within the meaning of the foregoing CBA provisions and applicable sections of the Workplace Violence Policy and the MSRPH, and if not, what the proper remedy should be.

## Facts

This case involves events that took place on the morning of May 8, 2012. On that morning, a serious verbal altercation erupted between the grievant and another employee, Walter Kenney.  Specific details of this altercation are given in the Discussion below.  In summary, Kenney claimed in his written statement[3] that prior to the beginning of the shift, he overheard the

---

[3] Kenney did not testify at the arbitration hearing.

grievant talking to another employee in disparaging tones about the sexual preference of one of their co-workers, and Kenney became convinced that they were referring to him. He claimed that this characterization was unfair, that it had been going on for some time, and this time he lost control. He confronted the grievant and cursed him out. In his written statement, Kenney acknowledged doing this and said he was disappointed in himself.

After the encounter with Kenney, the grievant began his shift, and while on his forklift, he spotted Supervisor George Wilson and approached Wilson, telling him that Kenney had cursed him out for no apparent reason. Wilson then located Kenney and took him into the break room in one of the Greenbelt Yard Landscaping Department's two buildings to ask him about what had happened. Kenney admitted what he had done, and Wilson then stepped outside in order to telephone his supervisor, John Hitchcock, Assistant Superintendent of Landscape Maintenance, to see what to do. While Wilson was talking to Hitchcock, the grievant approached, looking for Kenney. Wilson told the grievant that things were under control, but the grievant sidestepped him and went into the break room, where he confronted Kenney, and a loud verbal argument between the two men erupted. Wilson followed the grievant into the break room and separated them. On Hitchcock's instructions, both the grievant and Kenney were taken by separate vehicles and were administered drug and alcohol tests, both of which proved to be negative.

The central allegations against the grievant in Superintendent Grooman's termination memorandum of May 30, 2012 were as follows:

> Although Mr. Wilson told you not to go in the room with Mr. Kenney, you ignored him and entered the room. At this point, you and Mr. Kenney engaged in a loud argument, with both of you using threats and profanity. In your written statement, you admit that the two of you started to shout at each other.

At the time Mr. Wilson was talking to Mr. Hitchcock on the phone, Mr. Wilson had his phone in the speaker mode. Therefore, both Messrs. Wilson and Hitchcock could hear the threats and profanities being used by you and Mr. Kenney. In addition, Mr. Hitchcock heard you make a threatened statement to the effect that

> . . . if they did not stop fu\*\*ing with you, you were going to come in and kill every mother fu\*\*er in here . . .

Subsequently the two of you were separated by Mr. Wilson and transported for post-incident testing in separate vehicles. You could have followed the instruction of your supervisor to refrain from entering the room, but instead, you escalated the conflict with your action and words.

The termination memorandum then enumerated the seven instances of prior discipline that had been issued to grievant during his ten years of employment, and indicated, after references to the Authority's Workplace Violence Policy and to MSRPH rules, that the grievant was terminated, effective immediately.

## Positions of the Parties

The Authority argues that termination of the grievant was fully justified, both because of the grievant's violation of the zero-tolerance Workplace Violence Policy and as an appropriate implementation of progressive discipline, given the grievant's record of chronic disobedience of Authority rules. The Authority supports its argument with prior arbitration decisions by WMATA Boards of Arbitration, including the decision by Arbitrator Biren on April 21, 2013 upholding the grievant's most recent disciplinary action (a 30-day suspension) preceding the events involved in the present case.

The Union argues that the grievant's termination was fundamentally improper because of the Authority's reliance on the unverified statement claimed by Assistant Superintendent Hitchcock to have been made by the grievant during the verbal argument between the grievant and Walter Kenney while Supervisor George Wilson was attempting to separate them.

Hitchcock's testimony about what he claimed to have overheard was hearsay and was insufficient to meet the clear and convincing evidence standard that must be demonstrated by the Authority to sustain its decision to terminate the grievant. Further, the confrontation between the two men was initiated by Kenney and, and, leaving aside the statement that Hitchcock claimed to have overheard, the verbal interactions between the grievant and Kenney were similar to common "shop talk" in the work place, and even though they were profane and heated, they cannot be fairly categorized as workplace violence. Finally, the Authority inappropriately relied on the theory of progressive discipline since no prior disciplinary offense by the grievant involved the Workplace Violence Policy. The Union also supports its argument with prior arbitration decisions by WMATA Boards of Arbitration.

## Discussion

It is clear that in reaching its decision to terminate the grievant, the Authority gave substantial weight to the statement that Assistant Superintendent John Hitchcock claimed to have overheard the grievant say—that "If they did not stop fu**ing with you, you are going to come in and kill every mother fu**er in here."[4] Such a statement would be legitimately frightening to all who heard it and should not be tolerated in any workplace. Yet, after close examination of the evidence presented at the hearing, the Board does not find it credible that such a statement was made by the grievant. Absent that statement, the Board views what happened as little more than a garden variety workplace argument -- an argument deserving of discipline but not justifying termination of employment.

---

[4] This is the version as given as an indented quotation in the May 30, 2012 termination memorandum.

In testimony at the hearing, Supervisor Wilson's version of what happened and Assistant Superintendent Hitchcock's version of what happened were seriously incompatible. According to Hitchcock, he was driving to work when the first call from Wilson came in, reporting that a verbal altercation had occurred between the grievant and Kenney and asking advice about what to do. Hitchcock told Wilson that Wilson should take them both for drug testing, that Hitchcock would locate a second supervisor so that the two employees could be taken separately, and that Hitchcock would call Wilson back.[5] Hitchcock did call back and could hear a loud argument in progress. He said that he recognized the voices of the grievant and Kenney, and this is when Hitchcock claimed to have heard the grievant make the threat about killing everyone. He tried unsuccessfully to get Wilson's attention, then disconnected from the noisy connection on Wilson's speaker phone and called Wilson's personal phone, instructing Wilson to get help from the Transit Police. According to Hitchcock, Wilson and the two employees were at the time in the upstairs conference room.[6]

Wilson's version of events was quite different. According to Wilson, after the grievant was on his forklift on the morning of May 8, he stopped Wilson "and told me that Mr. Walter Kenney had just cursed him out and used profanity towards him, and he had no idea why he did that because he hadn't done anything to Mr. Kenney that morning, and I told him that I would immediately go find Mr. Kenney and talk to him about this incident."[7] Wilson then "spotted Kenney down at the bottom of the hill almost instantly," and Wilson got Kenney's attention and "told him that I need to speak with him in the morning meeting break room."[8] The grievant stayed on his forklift; Wilson and Kenney then went into the break room and Wilson closed the

---

[5] Tr., 73-74, 89.
[6] See Tr. at 77, 89-91.
[7] Tr., 35.
[8] Tr., 36.

door in order to be able to talk where no one else could hear.[9]  Only Wilson and Kenney were there, and Kenney admitted that he had cursed at the grievant, explaining that he had overheard the grievant earlier that morning talking to another employee about someone's sexuality, and Kenney thought it was about him.[10]  Wilson then told Kenney to sit still for a second and Wilson stepped outside and called Hitchcock, telling Hitchcock that they "had an individual [Kenney] who admitted being hostile and using profanity toward another employee [the grievant]."[11] Wilson asked Hitchcock what Wilson should do, and Hitchcock told him to "take him [Kenney] down," that is, take him for a drug and alcohol test.[12]  Then Wilson noticed the grievant walking toward him—the grievant came up and Wilson said he had the situation under control.  The grievant however sidestepped Wilson, saying he had to ask Kenney a question, and he went into the break room, with Wilson close behind.  Wilson said that he had been speaking to Hitchcock on his personal cell phone when he was outside, but when he re-entered the break room, the cell phone cut off because his personal phone "doesn't work in the break room."[13]  So Hitchcock then called Wilson back on Wilson's Metro phone [a Blackberry], which did work in the break room.

Inside the break room, the grievant confronted Kenney and, according to Wilson, stood over him and said that he "would fuck Kenney up" if Kenney ever talked to him like that again. Kenney got up immediately and got into it with the grievant. Wilson told Hitchcock to "hold on,"

---

[9] Tr., 38.
[10] Tr., 40-41.
[11] Tr., 42.
[12] Tr., 43.  According to Christopher Moore, Superintendent of Grounds Maintenance and Custodial Services, this was standard operating procedure whenever a verbal altercation occurred between employees. Tr., 121.
[13] Tr., 51.

and separated the two men, pushing them apart with his hands while holding the Blackberry, probably in his right hand.[14]

In assessing the inconsistencies between Wilson's and Hitchcock's versions of what happened, the Board credits Wilson's version. Wilson was a participant on the scene, whereas Hitchcock was imagining the scene solely through telephone conversations. According to Wilson, the participants were in the break room on the ground floor, not in an upstairs conference room. Wilson's first call was only about the misbehavior of Kenney, not both men. Hitchcock called Wilson back on Wilson's Metro phone, not his cell phone, and it is unlikely that Wilson answered his cell phone in speaker mode, although this may have occurred.[15]

One additional inconsistency is implicit in the "Initial Workplace Violence Incident/Threat Report" introduced into evidence as Authority Exhibit 1. That report was filled out and signed by John Hitchcock on May 9, the day after the incident between the grievant and Kenney.[16] Part III of the form is "Victim Information," and the victim identified by Hitchcock was William Hill. Part IV is "Suspect Information" and the suspect identified by Hitchcock was Walter Kenney. These entries by Hitchcock on May 9 are not reconcilable with the statement that Hitchcock allegedly overheard on May 8.

All things considered, the Board concludes that termination of the grievant was too severe a penalty. Because the grievant did become the aggressor, however, a substantial

---

[14] Tr., 69.

[15] This was not clear in Wilson's testimony. Hitchcock testified that Wilson's phone was in speaker mode, but Hitchcock also was certain (incorrectly according to Wilson) that it was Wilson's personal phone. Also, logically, when answering a phone in close proximity to a loud argument, the natural instinct would be to put the phone to one's ear in order to hear the caller's voice.

[16] The Manager of Special Projects in the Office of Plant Maintenance, Freddie Ross, testified that he guided Hitchcock on how to fill out the form. Tr., 105-106.

disciplinary penalty was justified.  Both participants behaved badly, and both must take care not to let this happen again.

### Decision

The Authority's decision to terminate the grievant is to be converted to a 90-day suspension.  The grievant is to be reinstated with full seniority and with back pay and benefits, except for the 90-day suspension.

James Oldham, Neutral

Paul McArthur, for the Union

DOUGLAS TAYLOR

Donna Gaffney, for the Authority   11/5/13

dissenting

-10-